MICHAEL SOLOMITA (*Pro Hac Vice*)
ALEX SCANDROLI (SBN 345278)
**NORTON ROSE FULBRIGHT US LLP**
555 South Flower Street
Forty-First Floor
Los Angeles, California  90071
Telephone:  (213) 892-9200
Facsimile:   (213) 892-9494
michael.solomita@nortonrosefulbright.com
alex.scandroli@nortonrosefulbright.com

Attorneys for Defendants
ROLAND CORPORATION, ROLAND CORPORATION U.S.

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| EMPOWER TRIBE COMMERCIAL FZE, a Dubai company, and EMPOWER TRIBE IP HOLDINGS LTD., an Abu Dhabi company,<br><br>Plaintiffs,<br>v.<br><br>ROLAND CORPORATION, a Japanese corporation, and ROLAND CORPORATION U.S., a Delaware corporation,<br><br>Defendants. | Case No. 2:25-cv-09658<br><br>[*Assigned to the Hon. Sherilyn Peace Garnett*]<br><br>**DEFENDANTS ROLAND CORPORATION'S AND ROLAND CORPORATION U.S.'S AMENDED REPLY IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FED. R. CIV. PROC. 12(b)(6)**<br><br>Hearing Date: February 25, 2026<br>Time: 1:30 p.m.<br><br>Complaint Filed: Oct. 9, 2025 |

**Table of Contents**

Page

I. INTRODUCTION ................................................................................................1

II. ARGUMENT .......................................................................................................1

    A. The '683 Patent is Invalid Under Section 101 ..................................1

        1. The Claims of the '683 Patent are Abstract Under *Alice* Step One ..........................................................................................1

            a. *The claims are directed to the abstract idea of collecting, analyzing, and displaying data* .................................................1

            b. *The Hardware in the Claims Has No Bearing on the focus of the Claims* ................................................................5

            c. *Plaintiffs' Assertions Would Preempt the Field of Polyphonic Tuners* ...................................................................9

        2. The '683 Patent Claims Lack an Inventive Concept ....................9

            a. *The Individual Components of the Claims are Well-Understood, Routine, and Conventional* ................................9

            b. *The Alleged Inventive Concept is not in the Claims* .............12

    B. Plaintiffs Failed to Adequately Plead Indirect Infringement ..........13

    C. Defendants Satisfied the Confer Requirement ...............................14

    D. The Court Should Deny Leave to Amend ........................................15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  573 U.S. 208 (2014) ............................................................................................. *passim*

*Am. Axle & Mfg. v. Neapco Holdings LLC*,
  967 F.3d 1285 (Fed. Cir. 2017) ..................................................................................... 2, 8

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
  788 F.3d 1371 (Fed. Cir. 2015) ........................................................................................ 9

*Association for Molecular Pathology v. Myriad Genetics, Inc.*,
  569 U.S. 576 (2013) ........................................................................................................ 2

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016) ...................................................................................... 10

*Berkheimer v. HP Inc.*,
  890 F.3d 1369 (Fed. Cir. 2018) ...................................................................................... 11

*CardioNet, LLC v. InfoBionic, Inc.*,
  955 F.3d 1358 (Fed. Cir. 2020) .................................................................................... 7, 8

*CarMax Auto Superstores California LLC v. Hernandez*,
  94 F. Supp. 3d 1078 (C.D. Cal. 2015) ........................................................................... 14

*Cervantes v. Countrywide Home Loans, Inc.*,
  656 F.3d 1034 (9th Cir. 2011) ....................................................................................... 15

*ChargePoint, Inc. v. SemaConnect, Inc.*,
  920 F.3d 759 (Fed. Cir. 2019) ....................................................................................... 12

*EcoServices, LLC v. Certified Aviation Serv., LLC*,
  830 F. App'x 634 (Fed. Cir. 2020) ............................................................................... 7, 8

*Electric Power Group, LLC v. Alstom, S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016) ......................................................................... 2, 6, 10, 12

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016) ........................................................................................ 5

*Gaelco S.A. v. Arachnid 360,
  LLC*, 293 F. Supp. 3d 783 (N.D. Ill. 2017) ..................................................................... 3

*Planet Bingo v. VKGS LLC*,
  576 F. App'x 1005 (Fed. Cir. 2014) ................................................................................. 2

*Powerblock Holdings, Inc. v. IFit, Inc.*,
  146 F.4th 1366 (Fed. Cir. 2025) ....................................................................................... 7

*RecogniCorp, LLC v. Nintendo Co.*,
  855 F.3d 1322 (Fed. Cir. 2017) .................................................................................. 12

*Sci. Applications & Rsch. Assocs. (SARA), Inc. v. Zipline Int'l, Inc.*,
  2024 U.S. Dist. LEXIS 99283 (N.D. Cal. June 4, 2024) .............................................. 12

*TLI Commc'ns LLC v. AV Auto., L.L.C.*,
  823 F.3d 607 (Fed. Cir. 2016) ....................................................................................... 2

*Trading Techs Int'l, Inc. v. IBG LLC*,
  921 F.3d 1378 (Fed. Cir. 2019) ..................................................................................... 2

*Trading Techs. Int'l v. IBG LLC*,
  921 F.3d 1084 (Fed. Cir. 2019) ................................................................................... 13

*Univ. of Florida Research Foundation, Inc. v. General Electric Co.*,
  916 F.3d 1363 (Fed. Cir. 2019) ............................................................................ 4, 5, 6

*Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC*,
  635 F. App'x 914 (Fed. Cir. 2015) ................................................................................ 3

*W. View Research, LLC v. Audi AG*,
  685 F. App'x 923 (Fed. Cir. 2017) ................................................................................ 2

*Yanbin Yu v. Apple Inc.*,
  1 F.4th 1040 (Fed. Cir. 2021) ....................................................................................... 2

**Rules and Statutes**

35 U.S.C. § 101 ................................................................................................................ *passim*

L.R. 7-3 .................................................................................................................... 14, 15

Rule 12 ..................................................................................................................... 11, 15

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiffs' opposition confirms that the claims of United States Patent No. 8,338,683 ("'683 Patent") are invalid under 35 U.S.C. § 101. Regarding *Alice* Step One, Plaintiffs admit that the focus of the claims are directed to collecting, analyzing, and displaying data, *i.e.*, analyzing and displaying the results of monophonic and polyphonic tuning. The case law dictates that such claims are directed to an abstract idea. Regarding *Alice* Step Two, Plaintiffs do not and cannot properly rebut the reality that the claims describe generic, conventional hardware such that the claims fail to recite an inventive concept.

Similarly, Plaintiffs concede that indirect infringement allegations require that specific elements must be pled in the Complaint. Plaintiffs' opposition, however, confirms that the Complaint fails to plead specific facts that plausibly show these elements. Rather, Plaintiffs engage in handwaving trying to connect dots in the Complaint that fall far short of the pleading requirements, and ask the Court to do the work for them. Plaintiffs' procedural arguments are an attempt to place form over substance to mask their deficient pleadings. As such, Plaintiffs' indirect infringement allegations should also be dismissed.

## II. ARGUMENT

### A. The '683 Patent is Invalid Under Section 101

#### 1. The Claims of the '683 Patent are Abstract Under *Alice* Step One

##### a. The claims are directed to the abstract idea of collecting, analyzing, and displaying data

Plaintiffs' first argue that under *Alice* Step One the inquiry starts and ends with the assertion that a "musical instrument tuner is a machine." (ECF No. 25 at 8:13-11:2). While "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title,"

DOCUMENT PREPARED ON RECYCLED PAPER

35 U.S.C. § 101, the Supreme Court has long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Association for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013). The Federal Circuit has "set forth a framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts. First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask 'what else is there in the claims before us?'" *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014).

To determine what a claim is "directed to," the Court looks to the "focus of the claimed advance." *Trading Techs Int'l, Inc. v. IBG LLC*, 921 F.3d 1378, 1384 (Fed. Cir. 2019). In other words, the Court starts by "asking what the patent asserts to be the focus of the claimed advance over the prior art." *Yanbin Yu v. Apple Inc.*, 1 F.4th 1040, 1043 (Fed. Cir. 2021). The Court must "focus on the claims, not the specification, to determine section 101 eligibility." *Am. Axle & Mfg. v. Neapco Holdings LLC*, 967 F.3d 1285, 1293 (Fed. Cir. 2017) (further stating that "features that are not claimed are irrelevant as to step 1 or step 2 of the *Mayo/Alice* analysis"). "[W]hether a device is 'a tangible system (in § 101 terms, a 'machine')' is not dispositive." *Yanbin Yu*, 1 F.4th at 1044 n.2.

The Federal Circuit has repeatedly held that drafting physical components into claims does not affect the § 101 analysis. *Alice*, 134 S. Ct. at 2360 ("[T]his Court has long warned against interpreting § 101 in ways that make patent eligibility depend simply on the draftsman's art," meaning that reciting "a handful of generic computer components" does not make an abstract idea patent eligible); *Planet Bingo v. VKGS LLC,* 576 F. App'x 1005, 1008 (Fed. Cir. 2014); *Electric Power Group, LLC v. Alstom, S.A.*, 830 F.3d 1350, 1352 (Fed. Cir. 2016); *TLI Commc'ns LLC v. AV Auto., L.L.C.*, 823 F.3d 607, 611 (Fed. Cir. 2016); *W. View Research, LLC v. Audi AG*, 685

- 2 -    Case No. 2:25-cv-09658
DEFENDANTS' AMENDED REPLY IN SUPPORT OF MOTION TO DISMISS

DOCUMENT PREPARED ON RECYCLED PAPER

F. App'x 923, 925-27 (Fed. Cir. 2017); *Gaelco S.A. v. Arachnid 360*, LLC, 293 F. Supp. 3d 783, 793 (N.D. Ill. 2017) (holding that "[b]ecause the hardware components in these cases were generic in nature, they did not make the abstract ideas at issue any less abstract," and that to hold otherwise would improperly permit "an author of claims [to] manipulate patent eligibility simply by drafting generic physical components into the claims"). Further, assertions that an invention passes muster at § 102 are insufficient to confer eligibility at *Alice* Step One. *Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC*, 635 F. App'x 914, 918-19 (Fed. Cir. 2015) ("If we adopt [Plaintiffs'] argument, all a patentee would need do to insulate itself from a § 101 challenge would be to identify a single prior art reference in the specification and state that its invention improves upon that reference.").

Plaintiffs, in no fewer than nine instances in the opposition, concede that the '683 Patent and its claims focus on collecting, analyzing, and displaying monophonic and polyphonic mode data. For example, Plaintiffs argue that:

> The '683 Patent claims a solution that permits a "guitar to be tuned easily by strumming/playing the strings simultaneously, and also facilitates precision tuning of individual strings." (*Id*., 2:41-44.) It does so by claiming a new and improved tuner that is physically capable of "simultaneous pitch frequency determination of several strings" via "a single audio channel." (*Id*., 2:46-49.) And it does so while providing "sensible/usable information" for both "monophonic and polyphonic signals." (*Id*., 2:51-53.)

(ECF No. 25 at 4:25-5:4; *see also id.* at 9:21-23; 10:25-27 ("[t]he specification identifies a specific problem—tuning guitar strings simultaneously and displaying the results accurately in different modes—and recites specific physical architecture for achieving this result"); 12:2-4; 13:10-18; 14:12-15 (describing the "'683 Patent's invention [as] a musical instrument tuner that can analyze and display the results of both monophonic plucking . . . and polyphonic strumming . . ."); 15:10-15 (stating that the applicants of the '683 Patent improved a musical tuner "by conceiving of and reducing to practice a specific solution: having two different user-selectable modes and two differentiated display modes corresponding to each"); 16:14-25; 17:4-10.

1  The Federal Circuit has clearly stated that collecting, analyzing, and displaying data
2  is an abstract idea under *Alice* Step One. (ECF No. 22 at 8:6-11:4).

3  Moreover, tuning is the quintessential definition of an abstract concept because
4  musicians have been tuning stringed instruments by ear for as long as there have been
5  stringed instruments. A musician would play a note, compare it in their mind to what
6  the note should sound like, and then adjust their instrument, repeating the process
7  until the notes matched. This is the most basic "monophonic tuner." '683 Patent at
8  20:55-21:6 (describing monophonic tuners as applying well-known stroboscopic
9  measurements). Likewise, a musician has been tuning by ear multiple strings played
10 at the same time allowing a person to differentiate "two pitch frequencies
11 simultaneously." '683 Patent at 1:26-29, 2:7-8, 26:31-33. Doing so with a tuner
12 would merely "seek[] to automate 'pen and paper methodologies' to conserve human
13 resources and minimize errors." *Univ. of Florida Research Foundation, Inc. v.*
14 *General Electric Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019).

15 Plaintiffs' opposition would have the Court believe that the '683 Patent
16 invented polyphonic tuning. Specifically, in the "Factual and Procedural
17 Background," Plaintiffs admit that monophonic tuners were known. (ECF No. 25 at
18 4:14-5:4). Plaintiffs then claim that monophonic tuners "could only 'measure one
19 pitch frequency at a time'" and that the '683 Patent "solved specific technical
20 problems" when "[s]uch monophonic tuners, if fed 'two pitch frequencies
21 simultaneously,' would fail to detect a 'valid input.'" *Id*. Plaintiffs argue that '[t]he
22 '683 Patent claims a solution that permit a 'guitar to be tuned easily by
23 strumming/playing strings simultaneously, and also facilitates precision tuning of
24 individual strings.'" *Id*. However, Plaintiffs neglect to inform the Court that the '683
25 Patent admits that polyphonic tuners were known in the prior art. *See, e.g.,* '683
26 Patent at 2:24-29 ("Another tuning device, in which frequency deviations for more
27 than one string at [a] time can be measured and displayed is disclosed in U.S. Patent

No. 6,066,790 by Freeland et al."). These admissions are also supported by other parts of the '683 Patent as well as the prosecution history of the '683 Patent as set forth in Defendants' opening papers.

Rather, as noted above, Plaintiffs admit that the alleged invention and focus of the claims is a "different way of providing monophonic . . . and polyphonic tuning information." (ECF No. 25 at 5:16-21). Unfortunately for Plaintiffs, this focus is directed to the abstract idea of collecting, analyzing, and displaying information.

### b. The Hardware in the Claims Has No Bearing on the focus of the Claims

Plaintiffs argue repeatedly that the Asserted Claims recite specific hardware. (*See, e.g.,* ECF No. 25 at 8:25-9:2). *University of Florida* is instructive. There, the Federal Circuit held the claims were ineligible under § 101. First, the Federal Circuit held that method claim 1 was representative of other claims, including system claim 6. 916 F.3d at 1366. Like the Asserted Claims here, those claims start with physical devices – bedside machines. Despite this limitation, however, the claims were found to be directed to "replacing" "'pen and paper methodologies' with 'data synthesis technology' in the form of 'device drivers written for the various bedside machines' that allow the bedside device to present data from the various bedside machines 'in a configurable fashion within a single interface.'" *Id.* at 1367. Such actions rendered the asserted patent "a quintessential 'do it on a computer' patent: it acknowledges that data from bedside machines was previously collected, analyzed, manipulated, and displayed manually, and it simply proposes doing so with a computer." *Id.* The Federal Circuit further found that the patent "nowhere identifie[d] . . . any 'specific improvement to the way computers operate.'" *Id.* at 1368 (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016)). Finally, the Federal Circuit found:

> [t]he claimed "programmatic action involving said machine-independent data" can be performed using "[a]ny kind of computer system or other apparatus," including a "general-purpose computer

system." And while the claims recite "presenting results from said programmatic actions upon a bedside graphical user interface ["GUI"]," the '251 patent explains "the invention is not limited by the particular GUI or data entry mechanisms contained within views of the GUI *Id.* (internal citations omitted).

Like the claims in *Univ. of Fla.*, the Asserted Claims purport to include physical features; such features, however, have no bearing on the focus of the claims and are therefore irrelevant to the *Alice* Step One analysis. The Asserted Claims are directed to "receiving" data – from the bedside monitors in *Univ. of Fla.* and from the input module here. In *Univ. of Fla.*, the claims provided for analysis of the data through "converting" the data into a different format and then performing a "programmatic action" upon it; here, the data is analyzed by the signal analyzer to determine "characteristics" of the signal. And as in *Univ. of Fla.*, the claims end with displaying the information. The Court need not tread new ground; Plaintiffs' arguments have been tested and refuted on numerous occasions, as they should be here.

Plaintiffs attempt to differentiate *Electric Power* by stating that the claim at issue was "untethered to any specific machine or device." (ECF No. 25 at 12:23-25). Not so. There, the analyzed claim was representative of various system claims, including claim 9. 830 F.3d at 1351 n.1. Like the Asserted Claims, system claim 9 required physical "monitor computers . . . for receiving . . . data," no different from the housing, input module, and signal analyzer here. The claims there involved the computer "receiving data," "detecting and analyzing events in real-time," and "displaying the event analysis," as they do here. *Id.* at 1351-52. The Federal Circuit held that the "focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools." *Id.* at 1354. The claims here, as Plaintiffs admit, are no different: they do not claim "computer-functionality improvements" and do not recite non-generic computer components. *Id.*; (ECF No. 25 at 15:10-11 "the applicants did not claim to have

improved 'the functioning of a computer'").

Instead, Plaintiffs attempt to analogize their tuner-computers to the physical dumbbells and motors in *Powerblock*. As Plaintiffs admit, the patent in *Powerblock* was directed to a technological improvement to a physical dumbbell system that included physical weights on either end and a selector connected to an "electric motor" that "physically moves the selector into different adjustment positions corresponding to the desired weight selected by a user." (ECF No. 25 at 10:4-14); *Powerblock Holdings, Inc. v. IFit, Inc.*, 146 F.4th 1366, 1369, 1372 (Fed. Cir. 2025). The Federal Circuit distinguished *Univ. of Fla.* on the basis that it involved a claim that merely performed steps using computer hardware. *Id.* at 1372 (internal citation omitted).

The claims here, by contrast, are very different. There is no mechanical manipulation of weights, no physical engine. Instead, the claims are directed to processes performed on computers: picking a mode, *see, e.g.*, '683 Patent at 5:14-16, 29:1, 29:7-31 (claim 1), receiving an input signal by an input module, *id.* at 28:66-67 (claim 1), running the signal through a signal analyzer, which "performs calculations based on the input signal," *id.* at 13:59-60, and displaying the results based on the selected mode, *id.* at 29:2-31—almost identical to the performed actions found ineligible in *Univ. of Fla.*

Nor do *CardioNet* or *EcoServices* help. In *CardioNet*, the Federal Circuit started with the fundamental question: did "the claims focus on a specific means or method that *improves the relevant technology*, or are [they] instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery?" *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368 (Fed. Cir. 2020). The court reviewed the claims and specification, finding that the focus was on "a specific means or method that improves cardiac monitoring technology" because the claimed invention "achieve[d] multiple technological improvements," including

DOCUMENT PREPARED ON RECYCLED PAPER

"more accurately detect[ing] the occurrence of atrial fibrillation and atrial flutter, increasing sensitivity, decreasing "false positives and false negatives," and "identify[ing] sustained episodes of atrial fibrillation and atrial flutter that have 'increased clinical significance.'" *Id.* at 1368-69. In other words, the claims at issue improved the actual operation of a cardiac monitoring device.

Similarly, in *EcoServices*, the Federal Circuit held that the claimed invention was a specific improvement to the system, claiming advantages over human washing including higher-quality washing, reduced risk of error, higher degree of safety, and improved reliability. *EcoServices, LLC v. Certified Aviation Serv., LLC*, 830 F. App'x 634, 643 (Fed. Cir. 2020). Here, the '683 Patent does not discuss any improvements to the tuner itself: no improved algorithm; no improved accuracy, and no improved tuning technology. Instead, it merely asserts an alleged improvement by displaying monophonic and polyphonic modes using generic processes and machinery.

While Plaintiffs attempt to tie in "bandpass filters" in order to confer eligibility, such arguments fail on multiple levels. First, bandpass filters are generic engineering components that have been used in circuits for many decades, and that perform limitations easily performed in the mind. Such components may not be used to change the abstract focus of the claims. *Alice*, 134 S. Ct. at 2360 ("[T]his Court has long warned against interpreting § 101 in ways that make patent eligibility depend simply on the draftsman's art," meaning that reciting "a handful of generic computer components" does not make an abstract idea patent eligible).

Second, the claims are not limited to the use of bandpass filters; the specification provides that they are "one method" of polyphonic pitch detection and the claims make no mention of and are not limited to the use of bandpass filters. '683 Patent at 25:59-64; *Am. Axle*, 967 F.3d at 1293 ("[F]eatures that are not claimed are irrelevant as to step 1 or step 2 of the *Mayo*/*Alice* analysis").

### c. *Plaintiffs' Assertions Would Preempt the Field of Polyphonic Tuners*

Rather than invent a new method of polyphonic tuning, Plaintiffs assert that the '683 Patent invented a tuner "that is physically capable of 'simultaneous pitch frequency determination of several strings' via 'a single audio channel.'" (ECF No. 25 at 5:1-2). In other words, Plaintiffs claim polyphonic tuning writ large. Such assertion triggers *Alice* Step One's "preemption" concerns. *Alice*, 573 U.S. at 216 (noting that the 101 exceptions are grounded in the issues of preemption). The concern with preemption is that "patent law not inhibit further discovery by improperly tying up the future use of these building blocks of human ingenuity." *Id.* "In other words, patent claims should not prevent the use of the basic building blocks of technology—abstract ideas, naturally occurring phenomena, and natural laws." *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015). Preemption therefore "signal[s] patent ineligible subject matter." *Id.* By claiming polyphonic tuning, Plaintiffs seek exclusive rights to polyphonic tuners, "exempting [them] from any future use." *Id.* Accordingly, even if Plaintiffs are correct, their claims are *still* ineligible because the use of generic components cannot be used to change the fact that the focus of the claims of the '683 Patent under *Alice* Step One is on the collection, analysis, and display of data.

## 2. The '683 Patent Claims Lack an Inventive Concept

### a. *The Individual Components of the Claims are Well-Understood, Routine, and Conventional*

As a threshold matter, Plaintiffs admit that all of the individual components are well-understood, routine, and conventional:

> Thus, as already described above (see Section IV.A.1), the asserted claims find "an inventive concept" . . . in the non-conventional and non-generic arrangement of known, conventional pieces."

(ECF No. 25 at 16:4-6, 17:1-3). For an ordered combination to provide an inventive concept, they must do more than what is "already present when the steps are considered separately." *Alice*, 573 U.S. at 225. Where, however, the Plaintiffs "fail[]

to identify what about the ordering of the steps in [the asserted claim] provides an inventive concept," the claim fails Step Two. *Bozeman*, 955 F.3d at 981.

Here, Plaintiffs "fail[] to identify" how the ordered combination is a "non-conventional and non-generic arrangement." "For the role of a computer in a computer-implemented invention to be deemed meaningful in the context of this analysis, it must involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Content Extraction*, 776 F.3d at 1347-48 (alteration in original) (quoting *Alice*, 134 S. Ct. at 2359). As the court in *Bascom* noted, merely reciting an abstract idea "perform[ed] on a set of generic computer components," as claim 1 does here, "would not contain an inventive concept." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

The Federal Circuit has time and again found such claims to fail *Alice* Step Two. In *Electric Power Group*, the Federal Circuit found on similar claims that there was no inventive concept because:

> the claims' invocation of computers, networks, and displays does not transform the claimed subject matter into patent-eligible applications. The claims at issue do not require any nonconventional computer, network, or display components, or even a "non-conventional and non-generic arrangement of known, conventional pieces," but merely call for performance of the claimed information collection, analysis, and display functions "on a set of generic computer components" and display devices.
>
> ***Nothing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information.*** That is so even as to the claim requirement of "displaying concurrent visualization" of two or more types of information, . . . even if understood to require time-synchronized display: nothing in the patent contains any suggestion that the displays needed for that purpose are anything but readily available. We have repeatedly held that such invocations of computers and networks that are not even arguably inventive are "insufficient to pass the test of an inventive concept in the application" of an abstract idea.

830 F.3d at 1355 (emphasis added).

Here, the claims perform a conventional activity in a conventional way, by

inputting a signal, analyzing the signal, and outputting the results. These activities are no different from those well-understood, routine, and conventional in the art. For example, the first paragraph of the background section of the '683 Patent discloses several patents that "can measure one pitch frequency at a time and display the [results]." '683 Patent at 1:24-26. The '683 Patent further admits that taking a measurement and analyzing it was well-understood, routine, and conventional, whether on a monophonic or polyphonic basis. *Id.* at 2:8-12 ("An element of such a system is a measurement part, which by using one method or another, measures the tuning of each string. Such systems may work only for a single string at a time, whereas others may work on all strings simultaneously."). The use of a "display" to show the analysis was further well-understood, routine, and conventional. *Id.* at 1:60-67 ("Some musical instrument tuners are generally applicable in that they have display means for indicating all 12 semitone names (from the chromatic scale)."). According to the background of the '683 Patent, the claimed steps are in a conventional, generic order: receive a signal, analyze it, and display it. Neither the specification nor the Complaint assert that the order of the steps was unusual and inventive.

Nor is Plaintiffs' proclamation that "whether this combination was 'well-understood, routine, or conventional is a question of fact' that makes disposition at the motion to dismiss stage inappropriate" proper. As noted above, the Federal Circuit has frequently found dismissal under § 101 proper at the Rule 12 stage. *Aviation Cap. Partners*, 2025 U.S. App. LEXIS 10828, at *1. Raising a "genuine question of material fact" requires Plaintiffs do more than provide a "conclusory declaration." *Berkheimer v. HP Inc.*, 890 F.3d 1369, 1372 (Fed. Cir. 2018). Plaintiffs must point to actual evidence "in the record" that supports their claim.

Plaintiffs attempt to bypass this requirement by citing to a case from the Northern District of California where the court found that the claims did not find a

DOCUMENT PREPARED ON RECYCLED PAPER

lack of inventive concept at *Alice* Step Two because the defendant failed to provide evidence that the claim used "a conventional ordering of steps." *Sci. Applications & Rsch. Assocs. (SARA), Inc. v. Zipline Int'l, Inc.*, 2024 U.S. Dist. LEXIS 99283, at *15, 18 (N.D. Cal. June 4, 2024). In contrast, here, Defendants have cited to the specification, admitted prior art, and existing case law, providing extensive evidence that the claims use the same, conventional ordering as every other tuner and computer. (ECF 22 at 11:21-15:7).[1]

### b. The Alleged Inventive Concept is not in the Claims

To save a patent at *Alice* Step Two, an inventive concept must be evident in the claims. *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017). "Ultimately, the §101 inquiry must focus on the language of the Asserted Claims themselves, and the specification cannot be used to import details from the specification if those details are not claimed. Even a specification full of technical details about a physical invention may nonetheless conclude with [unpatentable] claims" directed to an abstract idea. *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019). While Plaintiffs assert that there are "detailed technological improvements" that "are hardly 'generic,'" (ECF No. 25 at 16:14-25), they all fail for multiple reasons.

First, the details argued by Plaintiffs, such as how to perform polyphonic tuning using a single audio channel, the alleged "various implementations of the 'mode selector'", "methods of implementing the algorithms" and "classification schemes for differentiating between monophonic and polyphonic signals" are not present in the claims. Even when taking Plaintiffs' allegations as true, they are still

---

[1] Plaintiffs attempt to distinguish *Two-Way Media* by stating it did not involve "structural limitations." (ECF 25 at 17:11-20). Plaintiffs provide no support for their premise that "structural limitations" are transformative at *Alice* Step Two, and Defendants are unaware of any. To the contrary, "performance of the claimed information collection, analysis, and display functions 'on a set of generic computer components' and display devices" is insufficient at Step Two. *Elec. Power Grp.*, 830 F.3d at 1355.

unsupported by the claim language, and thus they cannot help it pass the *Alice* Step Two test.

Second, the technological improvement admitted by the Plaintiffs of "analyz[ing] and display[ing] the results of both monophonic plucking of a single string and polyphonic strumming of multiple strings, in a manner more helpful and valuable to a user," (ECF No. 25 at 14:12-17), is at best an improved user experience rather than a technical solution. As further admitted by the Plaintiffs, the "musical instrument tuner … as a whole, provides users with an improved tuning experience." (ECF No. 25 at 15:19-21). These are non-technical solutions that simply provide user "as much usable information as possible about the input signal" (ECF No. 25 at 17:4-10)—not enhancements to computer functionality. *Trading Techs. Int'l v. IBG LLC*, 921 F.3d 1084, 1090 (Fed. Cir. 2019).

Accordingly, the Court should find that there is no question of fact, and hold that the ordered combination is not a "non-conventional and non-generic arrangement" that confers an inventive concept that is significantly more than the abstract idea itself of collecting, analyzing, and displaying data.

### B. Plaintiffs Failed to Adequately Plead Indirect Infringement

Plaintiffs concede that "[f]or an allegation of induced infringement to survive a motion to dismiss, a Complaint must plead facts plausibly showing that the accused infringer ***specifically intended*** another party to infringe the patent and ***knew that the other party's*** acts constituted infringement." (ECF No. 25 at 19:22-27 (emphasis added)). First, for Defendants to be liable for inducement, the allegedly induced party or parties must commit at least some acts of direct infringement. The Complaint fails to *specify* any direct infringer other than Defendants. (ECF No. 1 at ¶ 21). Second, the Complaint fails to allege that Defendants (1) engaged in affirmative acts to induce infringement or (2) possessed the requisite specific intent. Plaintiffs cannot establish the specific intent merely by pointing to standard product manuals that describe non-

infringing functionality. Third, simply selling products is not sufficient to incur liability for inducing infringement because, without more, there is no basis from which to infer that customers are using those products in an infringing manner. Here, there are no facts alleged in the Complaint indicating that the customers to whom Defendants may have sold the products referenced in the Complaint are using those products in the manner claimed in the '683 Patent.

Plaintiffs likewise fail to adequately plead contributory infringement. Plaintiffs admit that they "must adequately allege: … 'the accused product is not a staple article or commodity of commerce suitable for a substantial non-infringing use.'" (ECF No. 25 at 21:2-9). But such allegations are completely missing from the Complaint. Product manuals that describe how to use monophonic and polyphonic tuning modes do not establish "no substantial non-infringing use" because these manuals merely explain standard tuner functionality that is well-known as acknowledged by the '683 Patent itself. '683 Patent at 1:19-2:40.

### C. Defendants Satisfied the Confer Requirement

Plaintiffs ask this Court to summarily deny the motion, or deem certain dismissal arguments waived, for not "strictly" complying with certain aspects of L.R. 7-3.[2] With respect to Defendants' grounds for dismissal, *Furie v. Infowars, LLC* reached the merits of a motion for summary judgment despite "the parties fail[ing] to meet and confer in strict compliance with [L.R.] 7-3[.]" 401 F. Supp. 3d 952, 970 (C.D. Cal. 2019). Here, as in *Furie*, Plaintiffs cannot establish prejudice by virtue of Defendants not specifically raising the pleading sufficiency arguments during the January 16 telephonic conference. By definition, a 12(b)(6) motion predicated on patent ineligibility means that the patent allegations fail to state a claim for which relief can be granted. This extends to Plaintiffs' derivative claims for induced and

---

[2] Plaintiffs are correct that non-compliance with L.R. 7-3 does not mandate denial of any aspect of Defendants' motion. *CarMax Auto Superstores California LLC v. Hernandez*, 94 F. Supp. 3d 1078, 1087-88 (C.D. Cal. 2015).

contributory infringement. Plaintiffs were on fair notice they would be defending the sufficiency of the allegations for claims that hinge upon the viability of that patent.

With respect to the certification itself, Defendants appreciate the import of, and in no way intended to disregard, local procedures governing conference of counsel. But the absence of an under-oath attestation did not result in prejudice to Plaintiffs when it is uncontested that the January 16 conference took place.

At bottom, the spirit and substance of L.R. 7-3 were observed. Indeed, § G(1)(d) of the Court's Standing Order contemplates penalties for non-compliance based on a failure to confer in "good faith." Because Plaintiffs have not shown that Defendants violated that tenet, the Court should reach the merits of the motion.

### D. The Court Should Deny Leave to Amend

The Court should deny Plaintiffs' request to amend the complaint. In the Ninth Circuit, "a district court may dismiss without leave where a plaintiff's proposed amendments would fail to cure the pleading deficiencies and amendment would be futile." *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011). In *Sanderling Mgmt. v. Snap Inc.*, the Federal Circuit first affirmed dismissal without leave under Rule 12, holding the claims were invalid under *Alice* and finding amendment would be futile. Like Plaintiffs here, Sanderling did not file a "proposed amendment" to the complaint with his response to the motion to dismiss under § 101. *Id.* at 706. The Federal Circuit further found that even if the amendment had been timely filed, however, it would have been futile. "No amendment to a complaint can alter what a patent itself states." *Id.*

Dated:  February 12, 2026

**NORTON ROSE FULBRIGHT US LLP**

By: /s/ *Michael Solomita*
MICHAEL SOLOMITA
Attorneys for Defendants
ROLAND CORPORATION, ROLAND CORPORATION U.S.