# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMPOWER TRIBE COMMERCIAL FZE, a Dubai company; and EMPOWER TRIBE IP HOLDINGS LTD, an Abu Dhabi company, | Case No. 2:25-cv-09658-SPG-AYP |
| Plaintiffs, | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS [ECF NO. 22]** |
| v. | |
| ROLAND CORPORATION, a Japanese corporation; and ROLAND CORPORATION, U.S. a Delaware corporation, | |
| Defendants. | |

Before the Court is the Motion to Dismiss, (ECF No. 22 ("Motion")), filed by Defendants Roland Corporation and Roland Corporation, U.S. ("Defendants"). In the Complaint, Plaintiffs Empower Tribe Commercial FZE and Empower Tribe IP Holdings Ltd. ("Plaintiffs") assert a single claim for patent infringement against Defendants. *See* (ECF No. 1 ("Complaint") ¶¶ 20–27). In the Motion, Defendants argue that the claims asserted under the patent are not patent-eligible and, as such, Plaintiffs cannot state a claim. *See* (Motion at 2). Having considered the submissions, the relevant law, the record in this

-1-

case, and oral argument, the Court GRANTS the Motion and DISMISSES the Complaint with prejudice.

## I.    BACKGROUND

Empower Tribe HQ FZE sells a product called the TC Electronic Polytune ("Polytune"). *See* (Compl. ¶ 7). The Polytune is covered by U.S. Patent No. 8,338,683, titled the "Polyphonic Tuner." *See* (*id*. ¶¶ 8–9). Empower Tribe IP Holdings owns the patent and licenses it to Empower Tribe HQ FZE for use in the Polytune. *See* (*id.* ¶ 8). The patent has two relevant claims. Claim 1 describes "a method for operating a musical instrument tuner." (ECF No. 1-1, Compl., Ex. A ("'683 Patent") at 28:56–57). Claim 30 (together with Claim 1, the "Asserted Claims") describes the "musical instrument tuner" itself. *See* (*id.* at 31:1). However, the two claims use substantially similar language. The Asserted Claims describe a "tuner comprising an input module, a signal analyzer, a display, a housing, [and] a user interface" with "the input module, the signal analyzer, and the display forming a part of said housing or being comprised in said housing." (*Id.* at 29:56–65); *see also* (*id.* at 31:2–13). The "input module receiv[es] an input signal from a musical instrument." (*Id.* at 28:66–67); *see also* (*id.* at 31:2–3). The display allows that signal to be shown in both a "monophonic display mode" and a "polyphonic display mode." (*Id.* at 29:2–5); *see also* (*id.* at 31:5–8). The tuner's "user interface" has a "mode selector" that allows users to switch between the tuner's "polyphonic mode" and "monophonic mode." *See* (*id.* at 29:1–2, 29:11–16); *see also* (*id.* at 31:10, 31:14–18). The polyphonic mode "establish[es] a polyphonic characteristic of the input signal" to display "multiple pitch frequencies derived from [the] input signal," and the monophonic mode "establish[es] a monophonic characteristic of the input signal" to display a single "pitch frequency derived from [the] input signal." (*Id.* at 29:17–31); *see also* (*id.* at 31:19–28).

Plaintiffs allege that Defendants sell at least three products (the "Accused Products") incorporating tuners that infringe on the Asserted Claims. *See* (Compl. ¶ 16). They allege that "[e]ach of these products comprises a tuner that reads on every limitation of Claim 30 . . . and each is accompanied by a manual clearly instructing end users how to practice the

method of Claim 1." (*Id.*). Plaintiffs allege that Defendants "are not authorized to practice any claim" of the '683 Patent. (*Id.* ¶ 17). Plaintiffs further allege that Defendants "directly infringe at least Claim 30" through the sale of the Accused Products and "contribute to or induce the infringement of at least Claim 1" because each of the Accused Products "permit a user to select between a monophonic mode and a polyphonic mode." (*Id.* ¶ 23).

On January 23, 2026, Defendants filed the instant Motion. On February 4, 2026, Plaintiffs filed an Opposition to the Motion, *see* (ECF No. 25 ("Opposition")), and on February 12, 2026, Defendants filed a Reply in support of the Motion, *see* (ECF No. 29 ("Reply")). The Court heard oral argument on February 25, 2026. *See* (ECF No. 30).

## II.    LEGAL STANDARD

Pursuant to § 101 of the Patent Act, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor." 35 U.S.C. § 101. However, "this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013) (internal alterations omitted). In *Alice Corporation Pty. Ltd. v. CLS Bank International*, 573 U.S. 208, 217 (2014), the Supreme Court articulated a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas" and "those that claim patent-eligible applications of those concepts." At the first step, a court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* "If the claims are not directed to a patent-ineligible concept under *Alice* step 1, the claims satisfy § 101 and [the court] need not proceed to the second step." *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1007 (Fed. Cir. 2018) (internal quotation marks omitted). However, even a claim directed to an abstract idea can be patent-eligible under step two. At step two, the court must determine whether the claims contain "additional elements" that "transform the nature of the claim[s]" through an "inventive concept." *Alice*, 573 U.S. at 217–18.

Patent eligibility "may be resolved on a motion to dismiss where there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Nat. Alternatives Int'l, Inc. v. Creative Compounds, LLC*, 918 F.3d 1338, 1342 (Fed. Cir. 2019) (internal quotation marks omitted); *see also Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1289–90 (Fed. Cir. 2024) ("[A]s we have repeatedly recognized, it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion." (internal quotation marks omitted)).  As in all Rule 12(b)(6) motions, the court must "accept all material allegations in the complaint as true, and construe them in the light most favorable to the non-moving party."  *Chubb Custom Inc. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013).  "[P]lausible factual allegations may preclude dismissing a case under § 101 where, for example, nothing on the record refutes those allegations as a matter of law or justifies dismissal under Rule 12(b)(6)."  *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1097–98 (Fed. Cir. 2016) (internal quotation marks, ellipses, and alterations omitted).

## III.  DISCUSSION

This action is premised on Defendants' alleged infringement.  *See* (Compl. ¶¶ 20–27).  Defendants argue that the Asserted Claims describe topics that are not patent-eligible and, therefore, the Complaint fails to state a claim.  *See* (Motion at 13–21).  As discussed below, the Asserted Claims are directed toward an abstract idea and lack an inventive concept to transform the nature of the claims.  Therefore, the Asserted Claims are not patent-eligible, and Plaintiffs cannot state a claim for patent infringement.

### A.    Alice Step One

In the first step of the *Alice* framework, courts "look at the focus of the claimed advance over the prior art to determine if the claim's character as a whole is directed to excluded subject matter." *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1149 (Fed. Cir. 2019).  In conducting this inquiry, courts "must focus on the language of the asserted claims themselves, considered in light of the specification." *Yu v. Apple Inc.*, 1 F.4th 1040, 1043 (Fed. Cir. 2021) (internal alterations omitted).  However, in considering

the specification, "features that are not claimed are irrelevant." *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1293 (Fed. Cir. 2020). Thus, while the specification may "be useful in illuminating" whether asserted claims are directed toward a topic that is not patent-eligible, "[t]he § 101 inquiry must focus on the language of the Asserted Claims themselves." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019).

Defendants argue that the Asserted Claims are focused on the abstract concept of "collecting, analyzing, and displaying data." *See* (Motion at 13). In support, Defendants rely on the Federal Circuit's decision in *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016). In that case, the court invalidated patent claims that described "systems and methods for performing real-time performance monitoring of an electric power grid by collecting data from multiple data sources, analyzing the data, and displaying the results." *Id.* at 1351. The court explained that "[i]nformation as such is an intangible" and, therefore, "collecting information," "analyzing information by steps people go through in their mind" or using "mathematical algorithms," and "presenting the results of [the] abstract processes of collecting and analyzing information" are all abstract ideas. *See id.* at 1353–54. The court then determined that the claims at issue were directed to an abstract idea because they described "a process of gathering and analyzing information of a specified content, then displaying the results." *Id.* at 1354.

In response, Plaintiffs argue that Defendants' argument is "overly reductive" because the Asserted Claims describe a "tangible device having a specific combination of elements that constitutes an improved musical instrument tuner." (Opp. at 18). In support, Plaintiffs rely on the Federal Circuit's decision in *PowerBlock Holdings, Inc. v. iFit, Inc.*, 146 F.4th 1366 (Fed. Cir. 2025). In *PowerBlock*, the Federal Circuit held that a mechanical invention to automate dumbbell weight stacking was patent eligible. *See id.* at 1374. The claim recited component parts of a specific type of dumbbell, a stack of nested weight plates, a handle, and a movable selector to adjust the weight plates. *See id.* at 1369. The claim used an electric motor connected to the selector to physically move the selector into different adjustment positions corresponding to the weight desired by the device's user.

-5-

*See id.* Based on the claim's description of how the system functioned, the Federal Circuit found that the claim described "a specific implementation of a technological improvement to selectorized dumbbells." *Id.* at 1372 (internal quotation marks omitted). The court explained that the patent was not directed toward "the abstract idea of automated weight stacking" because the claimed invention went "beyond claiming the broad concept of automating a known technique and provide[d] a sufficiently specific manner of performing automated weight stacking." *Id.*

The *PowerBlock* court further distinguished the mechanized dumbbell patent from a patent that the Federal Circuit invalidated in *University of Florida Research Foundation, Inc. v. General Electric Company*, 916 F.3d 1363 (Fed. Cir. 2019). In *University of Florida*, the plaintiff patented a "method and system for integrating physiologic data from at least one bedside machine" using a "bedside device" to "convert[] received datastreams from the bedside machines" into standardized data that "can be conveyed to the bedside device for display on a graphical user interface." *Univ. of Fla.*, 916 F.3d at 1366 (internal quotation marks and alterations omitted). On its face, the patent described a system and method to automate "pen and paper methodologies" to collect, analyze, manipulate, and display data. *See id.* at 1367. The Federal Circuit noted that the patent did not identify "any specific improvement to the way computers operate," "fail[ed] to provide any technical details for the tangible components" referenced in the patent, and "instead predominately described the system and methods in purely functional terms." *Id.* at 1367–68 (internal quotation marks and alterations omitted). As a result, the Federal Circuit concluded that the patent claims were "directed to the abstract idea of collecting, analyzing, manipulating, and displaying data." *Id.* (internal quotation marks omitted). In distinguishing *University of Florida*, the *PowerBlock* court emphasized that the patent at issue in that case "sought to automate 'pen and paper methodologies' to conserve human resources and minimize errors," whereas the claimed dumbbell patent was "directed to an eligible mechanical invention." *PowerBlock*, 146 F.4th at 1372.

In their Reply, Defendants argue that the hardware described in the claims has no bearing on the focus of the claims and, in that sense, the case is more like *University of Florida* than *PowerBlock*. *See* (Reply at 10–11). Defendants also argue that the claims in *PowerBlock* were "very different" from the Asserted Claims because the patents at issue in *PowerBlock* described a "physical engine" for the "mechanical manipulation of weights," whereas the Asserted Claims in this action "are directed to processes performed on computers." (*Id.*). Defendants note that, as in *University of Florida*, the Asserted Claims describe a device to receive, convert, analyze, and display data. *See* (*id.*). Defendants similarly distinguish several of Plaintiffs' other cited authorities as addressing claims focused on technological improvements to the "actual operation" of a device. *See* (*id.* at 11–12); *see also CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368–69 (Fed. Cir. 2020) (patent described a specific means or method to improve cardiac monitoring technology through configuration of technical components to more accurately detect the occurrence of atrial fibrillation and atrial flutter); *EcoServices, LLC v. Certified Aviation Servs., LLC*, 830 F. App'x 634, 643 (Fed. Cir. 2020) (patent described "a specific combination of a type of washing unit, information detector, and control unit, configured in a certain way to create technical improvements to systems for washing jet engines").

Here, the language in the Asserted Claims is focused on the idea of collecting, converting, and displaying frequency data. Both claims reference an "input module" that receives a "signal from a musical instrument." *See* ('683 Patent at 28:66–67); *see also* (*id.* at 31:1–3). The signal can be displayed in either a monophonic or a polyphonic frequency mode. *See* (*id.* at 29:2–5); *see also* (*id.* at 31:14–21). The monophonic mode represents the "pitch frequency derived from said input signal" and displays the "monophonic characteristic" of the signal "in the monophonic display mode." (*Id.* at 29:24–31). The polyphonic mode "establish[es] a polyphonic characteristic of the input signal," representing "multiple pitch frequencies derived from said input signal" and "displaying said polyphonic characteristic in the polyphonic display mode." (*Id.* at 29:17–24). The "method" described in Claim 1 recites "the steps of initiating a user session mode" and

"shifting the session mode" between the monophonic and polyphonic visual displays. *See* (*id.* at 29:6–17). The "device" asserted in Claim 30 generally describes a "musical instrument tuner" that is capable of displaying the signal captured from a musical instrument in a "monophonic display mode" and a "polyphonic display mode." (*Id.* at 31:1–8). However, Claim 30 only describes the technical configuration of the "device" in general terms, referring to an "input module," "signal analyzer," and "display" arranged to form "housing" or comprised within "housing," and a "user interface" that allows users to switch between monophonic and polyphonic display modes. *See* (*id.* at 31:1–18). Claim 30 otherwise describes the idea of displaying monophonic and polyphonic frequency data.

The patent specification has a similar focus. It acknowledges that existing patents describe "tuning device[s] for musical instruments" that "can measure one pitch frequency at a time and display the frequency deviation between the input signal and a target frequency." (*Id.* at 1:19–26). However, it claims that these patents are limited because they cannot display "polyphonic signal[s]" produced by simultaneous pitch frequencies. *See* (*id.* at 1:26–29). The specification further acknowledges a patent for "[a]nother tuning device, in which frequency deviations for more than one string at [a] time can be measured and displayed." (*Id.* at 2:24–25). However, that patent recites the use of the "same display format . . . whether one or several strings are played at a time," such that "only a small part of the display is used for showing relevant information" from monophonic signals. *See* (*id.* at 2:30–34). The specification claims an advance over the prior art by describing "a tuner with an improved visual output," showing "sensible/usable information" from both monophonic and polyphonic signals. *See* (*id.* at 2:45–46, 2:51–53).

Both the language in the Asserted Claims and the surrounding context in the patent specification are directed toward using computer technology for the abstract purpose of collecting, converting, analyzing, and displaying data. *See Elec. Power Grp*, 830 F.3d at 1353–54. Although the Asserted Claims generally describe certain components to accomplish this goal, "an underlying abstract idea cannot be 'saved' from its abstractness" through the use of components to "provide[] a generic environment in which to carry out

the abstract idea." *EcoServices*, 830 F. App'x at 643 n.5. Unlike in Federal Circuit decisions addressing patents focused on technological improvements, the Asserted Claims do not describe a "specific means or method" through which the components listed in the Asserted Claims "improve[] the relevant technology." *See CardioNet*, 955 F.3d at 1368; *see also PowerBlock*, 146 F.4th at 1372 (describing how the different components technically operate to perform automated weigh stacking). Instead, the Asserted Claims are "directed to a result or effect that itself is [an] abstract idea and merely invoke generic processes and machinery." *CardioNet*, 955 F.3d at 1368. The Court therefore proceeds to consider whether the Asserted Claims recite an inventive concept.

## B.    Alice Step Two

In the second step of the *Alice* framework, courts must determine whether a patent that describes an abstract idea introduces an "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 573 U.S. at 218 (internal alterations omitted). To do so, courts "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id.* (internal quotation marks omitted). This analysis is focused on "what the claim elements add" to determine if they "identify an inventive concept in the application of the ineligible matter to which . . . the claim is directed." *SAP Am., Inc. v. INVESTPIC, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018) (internal quotation marks omitted). "The abstract idea itself cannot supply the inventive concept, no matter how groundbreaking the advance." *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084, 1093 (Fed. Cir. 2019) (internal quotation marks omitted).

Defendants argue that the technical components described in the Asserted Claims are "generic computer components" that do not transform the Asserted Claims into something more than an abstract idea. *See* (Motion at 16); *see also Int'l Bus. Machines Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1379 (Fed. Cir. 2022) ("[C]laims to an abstract idea implemented on generic computer components, without providing a specific technical

solution beyond simply using generic computer concepts in a conventional way do not suffice at step two." (internal quotation marks omitted)). In support, Defendants refer to certain descriptions of the components from the patent specification. *See* (*id.* at 16–17). For example, Defendants cite to a portion of the patent specification that describes the "input module" recited in the Asserted Claims as either "a wire connecting the musical instrument" to the tuning device, a "wireless" connection "in the form of a Bluetooth signal," or "a microphone." *See* ('683 Patent at 13:24–31). Similarly, Defendants cite to portions of the patent specification that refer to the "signal analyzer" recited in the Asserted Claims as encompassing a "simple" monophonic or polyphonic pitch detector and that refer to the "display" as encompassing "a display for visual presentation of information," "a speaker for audible presentation," or "a motor . . . for mechanical presentation." (*Id.* at 9:35–42, 14:65–15:3).

In the Opposition, Plaintiffs do not contest that the Asserted Claims recite the use of generic computer components. *See* (Opp. at 20–24). Instead, Plaintiffs argue that the Asserted Claims "find 'an inventive concept' in the non-conventional and non-generic arrangement of known, conventional pieces." (*Id.* at 21 (internal ellipses omitted)). They further argue that what the Asserted Claims "invent[ed]" is "[t]he combination of a (1) user-operated mode selector, (2) mode-dependent signal analysis, and (3) differentiated mode-dependent displays [that] result[] in a selectable polyphonic and monophonic tuner." (*Id.* at 22). Plaintiffs argue that this combination of elements "is the non-conventional and non-generic arrangement" that constitutes the inventive concept described in the '683 Patent. *See* (*id.*); *see also* (*id.* at 21 (reciting the same combination of elements)).[1] In

---

[1] Plaintiffs also argue that the patent specification recites "detailed technological improvements," such as "methods implementing [] algorithms to establish monophonic or polyphonic characteristics" and "different classification schemes for differentiating between monophonic and polyphonic signals." (*Id.*). However, the § 101 inquiry "must focus on the language of the Asserted Claims themselves," and "the specification cannot be used to import details . . . if those details are not claimed." *ChargePoint*, 920 F.3d at 769. The "technological improvements" that Plaintiffs rely on in the patent specification are not "evident in the claims" and, as such, do not supply "an inventive concept sufficient

support, Plaintiffs rely on a decision from the Northern District of California that denied a motion for judgment on the pleadings at *Alice* step two. *See Sci. Applications & Rsch. Assocs. (SARA), Inc. v. Zipline Int'l, Inc.*, No. 22-CV-04480-JSC, 2024 WL 2852139, at *6–7 (N.D. Cal. June 4, 2024). In that case, the court considered a patent for an acoustic airspace collision detection system. *See id.* at *1. The claim recited an acoustic collision detection system comprised of an array of acoustic probes, and a digital signal processor configured to receive acoustic data from the probes, filter out noise, extract the signals emanating from an approaching target, calculate the intensity and bearing of the target, and determine whether the target was on course for potential collision with an aircraft. *See id.* At *Alice* step one, the district court determined that the claim was directed to the abstract idea of collecting, filtering, and analyzing information. *See id.* at *4. However, at *Alice* step two, the district court found that the claim "'disclose[d] a specific, discrete implementation of the abstract idea' through an ordered combination of elements performed by computer components." *Id.* at *6 (quoting *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016)). The court further emphasized that, even if the claim's "structural components are generic," the defendant "fail[ed] to identify any support within the [] patent or the pleadings to establish, as a matter of law, the ordered steps are not inventive in combination." *Id.* at *7.

In their Reply, Defendants argue that *SARA* is distinguishable because they have "cited to the specification, admitted prior art, and existing case law" to show "that the claims use the same, conventional ordering as every other tuner and computer." (Reply at 16). Specifically, Defendants note that the patent specification incorporates United States Patent No. 6,066,790 by reference and that patent "recites the ordinary operation of tuners as receiving an input data stream, which is processed by the tuners before being displayed for the user." (Motion at 17); *see also* ('683 Patent at 2:23–40 (describing tuning device

---

to transform the nature of the claim[s] into a patent-eligible application" of an otherwise abstract idea. *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017) (internal quotation marks omitted).

through "which frequency deviations for more than one string at [a] time can be measured and displayed")). Defendants also claim that the patent specification makes it clear that "displaying monophonic and polyphonic results was well-understood, routine, and conventional in the [prior] art." (Motion at 18); *see also* ('683 Patent at 1:19–29 (describing tuning devices that "can measure one pitch frequency at a time and display the frequency deviation between the input signal and the target frequency")).

Defendants argue that the Asserted Claims are similar to claims that the Federal Circuit invalidated in *Two-Way Media Ltd. v. Comcast Cable Communications, LLC*, 874 F.3d 1329 (Fed. Cir. 2017). In that decision, the Federal Circuit considered a patent that described "a system for streaming audio/visual data over a communications system like the internet." *Id.* at 1333. The claim recited "[a] method for transmitting message packets over a communications network" comprising the steps of "converting a plurality of streams of audio and/or visual information" into streams of "addressed digital packets complying with the specifications of a network communication protocol," routing those streams to users through selection signals received by users, monitoring the reception of packets, and accumulating records to indicate what streams were received by which users. *Id.* at 1334–35. At *Alice* step one, the court held that the claim "recites a method for routing information using result-based functional language" and was therefore directed to an abstract idea. *See id.* at 1337–38. At *Alice* step two, the court determined that the claim lacked an inventive concept because it used "a conventional ordering of steps—first processing the data, then routing it, controlling it, and monitoring its reception—with conventional technology to achieve its desired result." *Id.* at 1339. Defendants argue that, as in *Two-Way Media*, the Asserted Claims describe a conventional ordering of steps with conventional technology. *See* (Motion at 19–20).

The Court agrees that nothing in the claim limitations, considered individually and together as a whole, is sufficient to transform the Asserted Claims into a patent-eligible invention. Although Plaintiffs repeatedly reference the "structural limitations" recited in the Asserted Claims, Plaintiffs do not meaningfully respond to Defendants' argument that

the patent specification demonstrates that the Asserted Claims only describe generic computer components. *See, e.g.*, ('683 Patent at 13:24–31). Indeed, Plaintiffs seemingly concede that the technical components recited in the Asserted Claims do not supply the inventive concept necessary to transform the claims, writing that the "inventive concept" comes from the "non-conventional and non-generic arrangement of known, conventional pieces." (Opp. at 21). In defining that arrangement, Plaintiffs describe the idea of allowing users to choose whether to view frequency data in a monophonic or polyphonic format, transmitting that data to a tuning device, and displaying the data on a screen. *See* (*id.* at 22). Although the Asserted Claims purport to do so through the use of computer parts, the Asserted Claims "fail[] to provide any technical details for the tangible components" and "predominantly describ[e] the system and method[]" claimed "in purely functional terms." *Univ. of Fla.*, 916 F.3d at 1368; *see also Two-Way Media*, 874 F.3d at 1339 (references in claims to network communication protocol and selection signals for routing user data did not transform claims because the asserted claims did not specify the rules forming the communication protocol or the parameters for the user signals). Thus, considered as a whole, the Asserted Claims merely recite the application of an abstract idea through the use of generic computer components. *See Univ. of Fla.*, 916 F.3d at 1369 ("An inventive concept cannot simply be an instruction to implement or apply the abstract idea on a computer" (internal ellipses omitted)). Because the Court finds that the Asserted Claims are directed to an abstract idea and lack an inventive concept to transform the Asserted Claims, the Court GRANTS the Motion.

The Court further determines that it would be futile to grant Plaintiffs leave to amend. *See U.S. Pat. No. 7,679,637 LLC v. Google LLC*, 164 F.4th 1373, 1380 (Fed. Cir. 2026) ("[N]o amendment to the complaint can alter what the [patent] itself states."); *see also Papst Licensing GmbH & Co. KG v. Xilinx Inc.*, 193 F. Supp. 3d 1069, 1095 (N.D. Cal. 2016) (patent-ineligibility is "a defect which cannot be cured through amendment").

///

///

## IV.    CONCLUSION

For all the foregoing reasons, the Complaint is DISMISSED WITH PREJUDICE.

**IT IS SO ORDERED**

DATED:    July 7, 2026

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE